# EXHIBIT 1

An Imprint of
HarperCollins*Publishers*

10 E. 53rd Street
New York, NY
10022-5299

Telephone 212 207-7474
Fax 212 207-7973

Judith Regan
President and Publisher

 ReganMedia

Dated as of April 1, 2004

Jenna Massoli p/k/a Jenna Jameson
Club Jenna INC.
15270 North 83rd Pl.
# 200
Scottsdale, AZ 85260

Re: ReganMedia -w- Jenna Massoli p/k/a Jenna Jameson

Dear Jenna:

This letter confirms the agreement (the "Agreement") between ReganMedia ("ReganMedia") and Jenna Massoli p/k/a Jenna Jameson ("Jameson") in connection with the possible development, production, distribution and exploitation of the projects described on Exhibit A attached hereto and any similar projects (each, a "Project"). In consideration of each party's efforts to obtain financing for and/or set up the projects for development, production, distribution and exploitation, and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereby agree as follows:

1.     ReganMedia shall have the exclusive right to pitch, submit and represent each Project to television networks, motion picture studios and other potential financiers (collectively, "Financiers") for the purpose of obtaining financing and/or other commitments from such Financiers for the development, production, distribution and exploitation of each such Project and/or soliciting interest from such Financiers in optioning, purchasing or otherwise acquiring rights in and to each such Project.

2.     If a Financier desires to finance the development, production, distribution and/or other exploitation of any Projects and/or license, option, purchase or otherwise acquire any rights in any Projects, then each such Project shall be a ReganMedia production and Judith Regan ("Regan") shall be an executive producer. In addition, with respect to each Project other than the first Project listed on Exhibit A attached hereto (i.e., the interview project), Jameson shall be also be an executive producer of such Project and such Project shall be a joint production of ReganMedia and Jameson's production company, Jennasis Entertainment, Inc. ("Jennasis Entertainment"). Jameson and Regan shall negotiate their executive producer deals with any Financiers together and in good faith, including, without limitation, with respect to the fees and other compensation related to their executive producer services in connection with any Project (e.g., profit participations, passive royalties, ratings bonuses, etc.). Jameson shall negotiate in good faith her own agreements with respect to her on-camera services for any Project. The aggregate fixed compensation and the contingent compensation (e.g., profit participations, ratings bonuses, passive royalties, etc.) payable to the Parties for their executive producer services in connection with any Project shall be split between the Parties on a 50-50 basis. The aggregate fixed compensation payable to Jameson for her on-camera services in connection with any Project shall be retained 100% by Jameson. The aggregate contingent compensation (e.g., profit participations, ratings bonuses, passive royalties, etc.) payable to Jameson in connection with her on-camera services for any Project shall be split between the parties on a 90-10 basis (i.e., 90% to Jameson and 10% to ReganMedia).

3.     The parties' agreements with the Financier of any Project shall (a) be consistent with custom

243690.2
041404

Case 2:05-cv-00854-EHC     Document 52-2     Filed 10/04/2005     Page 2 of 19

and practice in the entertainment industry in light of each party's precedent and stature in the entertainment industry and in light of the facts and circumstances relating to the Project and (b) contain all agreements, representations and warranties as are customary for agreements of the type specified. Neither party shall refuse a reasonable offer made by the Financier with respect to their respective rights and services in connection with any Project.

4.     As between Jameson and ReganMedia, all creative and business decisions with respect to each Project, including, without limitation, any and all agreements with Financiers, shall be subject to the mutual approval of both parties; provided that the terms and conditions of any agreements for Jameson's on-camera services shall be subject to Jameson's sole control and approval.

5.     The parties acknowledge that the intended credits with respect to each Project shall be as follows: (a) "Executive Producer" credits for Jameson and Regan (on separate or shared cards as the Parties may agree); (b) production company and (if possible) logo credits for Jennasis Entertainment and ReganMedia; (c) "Created By" credit for Jameson and Regan; and (d) such other credit for Jameson's on-camera services as the applicable Financier may agree to. Notwithstanding the foregoing, in the interest of journalistic integrity, neither Jameson nor Jennasis Entertainment shall be entitled to any credits in connection with the first project listed on Exhibit A attached hereto (i.e., the interview project).

6.     Neither party hereto shall proceed with the further development, production, distribution and/or other exploitation of any Project, or option, license, sell or otherwise dispose of or encumber any rights in and to any Project, unless and until both parties have agreed to all the terms and conditions of their agreements with the applicable Financier of such project.

7.     Each party is an independent contractor and not an agent, partner, co-venturer, franchisee, affiliate or employee of the other, and no fiduciary relationship exists between the parties. Each party represents and warrants that (a) it has the right, power and authority to enter this Agreement; (b) the consent of no other person or entity is necessary in order for such party to enter and fully perform this Agreement and (c) it has not granted, assigned, transferred or otherwise encumbered any rights in or to any Project to any third party that would or might interfere with the performance of this Agreement. Neither party shall bind the other party to any third party obligation or hold itself out as having the authority to do so.

8.     Subject paragraph 9 below, this Agreement supersedes any prior oral or written agreement(s) and/or understanding(s) between the parties with respect to the subject matter of this Agreement. This Agreement may only be amended by a written instrument signed by both parties hereto. This Agreement shall be construed, interpreted and governed by the laws of the State of New York without regard to any conflicts of law principles. It is contemplated that the parties may enter into a more formal agreement containing the terms set forth in this letter together with such additional terms and conditions negotiated in good faith as are customarily contained in agreements of this type. Until such time as a more formal agreement is fully signed, if at all, this Agreement together with such customary terms and conditions will be binding. This Agreement may be signed via facsimile and in counterparts.

9.     Nothing herein shall be deemed to supersede, amend or otherwise modify that certain letter agreement between ReganBooks, on one hand, and Jennasis Entertainment and Jameson, on the other hand, dated April 22, 2003, relating to the grant to HarperCollins Publisher's, Inc. of certain subsidiary rights in and to an autobiography about Jameson's life as a porn-superstar to be published by HarperCollins.

243690.2
041404

2

Case 2:05-cv-00854-EHC    Document 52-2    Filed 10/04/2005    Page 3 of 19

Please acknowledge your acceptance of the foregoing terms by signing two (2) copies of this letter in the space provided below and returning one (1) fully executed copy to ReganMedia.

Sincerely,

REGANMEDIA

By: _____

Name: Judith Regan

Its: _____

ACCEPTED AND AGREED:

Jenna Massoli p/k/a Jenna Jameson

243690.2
041404

3

## PROJECTS

1.     "How to Make Love Like A Porn Star: A Cautionary Tale":  A one hour special based on Jenna's memoir "How to Make Love Like a Porn Star", which would be an interview with Jenna and her friends and family, video-clips and photos from Jenna's personal and professional life, etc.

2.     "BPorn Again".  A reality-based television program about the various aspects of Jenna Jameson's life – from her celebrity status as the most famous porn star in the world to the challenges and problems she faces as a regular everyday person. Jenna leaves the world of porn to pursue a "normal" life and motherhood, encounters difficulties conceiving a child and seeks advice from others (e.g., a mother-figure, a priest, a therapist, spiritual leader, etc.).  We follow her on her journey to regain her innocence.

243690.2
041404

4

# EXHIBIT 2

Case 2:05-cv-00854-EHC     Document 52-2     Filed 10/04/2005     Page 6 of 19

# TELEVISION REALITY SERIES/PROJECT
## PRODUCTION AGREEMENT

This AGREEMENT is made this ___ day of December, 2004, by and between A&E Television Networks, a New York partnership with its principal place of business located at 235 East 45th Street, New York, New York ("AETN") and Dolce Amore, Inc., a Colorado corporation (the "Company") with its business address for the purposes of this agreement being c/o The Endeavor Agency, 9601 Wilshire Blvd., Beverly Hills, California 90212 (attn: Sean Perry).

## RECITALS:

WHEREAS, AETN desires to finance and produce a pilot and reality television series based upon the day-to-day life and routine of Jenna Massoli, professionally known as JENNA JAMESON (the "Artist"), and her husband, John G. "Jay" Grdina, under the title *Jenna Jameson By Day* or such other or additional title as AETN may deem appropriate (the "Series"); and

WHEREAS, the Company has entered into an Exclusive Acting Services Agreement with Jenna Jameson to provide on-camera/on-air acting services in connection with the production of a reality-based television series; and.

WHEREAS, The Endeavor Agency is the designated agent for the Artist with respect to the Pilot and Series.

NOW, THEREFORE, in consideration of the fees, mutual promises and undertakings set forth herein, the parties mutually agree as follows:

1.    TERM AND TERMINATION: The Term of this Agreement shall commence on the date hereof and continue for so long as AETN shall have any rights in the Pilot and the Series. If Company at any time materially breaches any provision of this Agreement or Company is at anytime unable to provide the on-camera services of Artist for any reason, including without limitation Artist's failure or refusal to perform or her incapacity (as defined below), AETN may, at its sole option after granting Artist a three (3) day period in which to cure any such breach or incapacity, terminate this Agreement at any time during the continuance of such breach or at a reasonable time thereafter or, in the case of the incapacity of Artist, at any time during the continuance of such period or at any time thereafter, and may reduce Company's compensation hereunder *pro rata* and, if necessary, Company shall return any prorated share of money already remitted to Company by AETN as soon as practicable but in no event later than ten (10) business days after AETN's termination of this Agreement. The term "incapacity" shall mean any physical or mental disability rendering Artist unable fully to perform all required on-camera services for seven (7) consecutive AETN work days.

2.    PILOT EPISODE AND BUDGET: AETN shall finance the production of one pilot episode (the"Pilot"), which shall have a budget, inclusive of any and all talent fees and non-recoupable portion of Company fees (as defined below) of not less than $175,000 nor more than $200,000. The Pilot shall be approximately thirty (30)

46964v1

minutes in length. AETN shall make the final decision as to what production company shall produce the Pilot, but AETN shall consult with Company regarding candidates for that job and the criteria for that selection.

3.    SERVICES TO BE PROVIDED: Company shall guarantee and provide the on-camera services of Artist as the subject and principal on-screen personality and performer of the Pilot and, if applicable, the Series. The Series shall focus on Artist's day-to-day life, both in her home and in the realm of her professional endeavors. Cameras shall follow Artist in "real-time" and track her, her husband, certain relatives and colleagues as they go about their lives and business activities, with Artist juggling a film and video career, book and endorsement deals, public appearances, and other ventures. The parties shall conduct good faith negotiations and develop a mutually acceptable meaning and/or expectation of the phrase "real-time" for purposes of the project.

4.    COMPENSATION:

    a.    COMPANY FEE: Company shall be paid a fee of One Hundred Fifty Thousand Dollars ($150,000) (the "Company Fee") for the Pilot. In the event AETN elects not to proceed beyond the Pilot stage of this project (i.e., by not exercising the Initial Option set forth in Subparagraph 8(a) below), Company shall retain the entire Company Fee. If however, AETN elects to proceed with the Series (i.e., by exercising the Initial Option set forth in Subparagraph 8(a) below), One Hundred Thousand Dollars ($100,000) of the Company Fee shall be applied against any fees payable to Company in connection with each episode of the Series produced in Season One (i.e., purusuant to the Initial Option set forth in Subparagraph 8(a) below) at the rate per episode set forth in Subparagraph 4(b)(i) below.

    b.    EPISODE FEE: In the event AETN exercises the Options set forth in paragraph 8 below, and subject to application of the portion or portions of the Company Fee as provided in Subparagraph 4(b) above, Company shall be entitled to an "Episode Fee" for its services as follows:

        (i.) For "Season One" (as defined in Subparagraph 8(a) below) the Episode Fee shall be Thirty-Two Thousand Five Hundred Dollars ($32,500) per Episode.

        (ii.) For "Season Two" (as defined in Subparagraph 8(b) below) the Episode Fee shall be Forty-Two Thousand Dollars ($42,000) per Episode.

        (iii.) For "Season Three" (as defined in Subparagraph 8(b) below) the Episode Fee shall be Fifty Thousand Dollars ($50,000) per Episode.

    c.    The compensation set forth in this paragraph shall constitute complete payment for: (i) all services which AETN shall require Artist to render in the Pilot or the applicable episode of the Series under this Agreement; and (ii) all on-air appearances of Artist's husband, staff, colleagues, relatives and friends. No additional payments shall be required by Company or Artist. Company shall be solely responsible for compensation of Artist as provided in its contract and shall indemnify and hold AETN harmless on any

46964v1

claim for compensation by Artist arising from or out of the agreement between Company and Artist.

d. Nothing herein shall require or be construed to require AETN to telecast or otherwise use, distribute or exploit the Pilot, the Series or any episode(s) thereof, or otherwise to utilize the results of Artist's on-camera services. Any decision by AETN not to telecast or otherwise exploit the Pilot or the Series or any episode(s) thereof shall not be deemed or construed to constitute a breach or violation of this Agreement by any party. With respect to the Pilot and/or any episode(s) of the Series, Company understands and agrees that, upon payment by AETN of the Company Fee and/or any applicable Episode Fee, AETN shall be deemed to have completely fulfilled its monetary obligations to Company with respect to the Pilot and/or the applicable Episode of the Series.

e. Compensation shall be payable by AETN to Company and remitted to the Agent. Payment of the Company Fee shall be due and payable within ten (10) business days of the execution and acceptance of this Agreement by all parties, but in no event later than the commencement of production of the Pilot. Payment of any and all Episode Fees shall be due and payable in full on or before the commencement of production of each episode.

f. Compensation is based upon episodes of one-half hour of on-air time. Any episode or special which exceeds or is intended to exceed one (1) half hour of air time shall be compensated as multiple episodes according to the schedule of Episode Fees stated above. Each half hour of on-air time shall be compensated as a single episode, whether or not the actual duration of on-air time for any single telecast exceeds one (1) half hour.

g. LICENSE FEES: AETN shall pay Company Twenty Five percent (25%) of any and all license fees that AETN receives for the distribution and exploitation of the Pilot and/or Series on *television* outlets other than AETN's Networks, ~~in international markets and/or to any television outlets~~. AETN's "Networks," as used herein, shall mean any television programming service owned, controlled, programmed, or operated by AETN solely or jointly with one or more third parties, including *A&E Network, The History Channel, The Biography Channel, History International, History Channel en Espanol,* or any successors to such entities or other licensees of AETN's name(s), trademark(s), and/or format(s) in any territory and any language. License fees as provided in this subpart (g) shall not apply in any way to the licensing of Videograms as provided below.

5. ON SCREEN CREDITS: John G. Grdina shall be accorded on-screen credit as an Executive Producer of the Pilot and, if applicable, the Series. On-screen credit shall also be given to the A&E Network Executive Producers, currently anticipated to be Nancy Dubuc and Rob Sharenow, as well as any production company or persons mutually selected by the parties to produce the Pilot and/or the Series. In addition, Company, and/or its affiliate Club Jenna, Inc., shall also be accorded an on-screen credit. On-screen credits as provided herein shall apply to the Pilot and (if applicable) each episode of the Series. On-screen credits shall be of sufficient size, typeface and placement to maximize the probability of viewer recognition.

46964v1

6. **WIRELESS/MOBILE MEDIA AND VIDEOGRAM PRODUCTION AND DISTRIBUTION RIGHTS:**

a. **Exclusive License and Authority:** Subject to Company's performance of all of its obligations hereunder, and in consideration of the payment of video royalties by Company to AETN as provided below, AETN, as holder of the copyright in the Pilot and the Series, hereby grants to Company the exclusive right and license, in perpetuity, to copy, produce and distribute the Pilot and Series via Videogram and Wireless/Mobile Networks. The term "Videogram" as used herein shall mean videocassette, video disc and all other video device forms and configurations, including "Linear Interactive Device(s)" and "Non Linear Interactive Device(s)" and any and all interactive devices or technologies now or hereafter developed. The term "Wireless/Mobile Network" as used herein shall mean any and all networks, devices, technologies or Internet-based media now known or hereafter developed which are capable of transmitting voice, data, images, text or digital information to handheld or computer-based receivers via wireless or satellite transmission. Wireless/Mobile networks shall not include radio or television networks, transmission systems, telecasts or broadcasts. For the entire term of this Agreement, Company shall have the right to state on the back of the packaging for Videograms of episodes of the Pilot or the Series (or of any compilations created from material in the Pilot and/or the Series) or on a sticker attached to such packaging that, as applicable, the episode(s) of the Series has/have been or may be "seen on A&E Network." (Such notices customarily employ the phrase "as seen on A&E Network.") For the purpose of such notices, Company shall, for the Term of this Agreement, have the right to use AETN's trademarks "A&E," "A&E NETWORK" and the "A&E" Logo (hereinafter, the "A&E Trademarks") in the forms provided and approved by AETN. The use of the A&E Trademarks, whether on packaging or on stickers, shall be in conformity with AETN's trademark use and protection guidelines (which shall be provided to Company upon request), including in each case the use of the appropriate protective symbols. The limited trademark license contained in this Subparagraph 6(a) may be terminated by AETN if Company fails to conform to AETN's trademark use and protection guidelines. In the event AETN becomes aware of any use of the A&E Trademarks by Company which is not in conformity with AETN's trademark use and protection guidelines, AETN shall so notify Company in writing and Company shall have five (5) business days in which to cure such nonconforming use. If Company does not cure the nonconforming use of the applicable A&E Trademark in such five-day period, AETN may terminate the trademark license contained in this Subparagraph 6(a) by further written notice to Company; and such termination shall be effective on the day following Company's receipt of that notice. This license is limited to the uses described herein and for no other purpose, it being understood that such use shall not extend to the direct or indirect endorsement of any product or service. Upon request by Company, AETN shall provide such other and further documentation as Company may reasonably require to effectuate the purposes of this provision, including letters of direction to any printer of packaging or stickers.

b. **Internet Rights and Video on Demand:** Subject to AETN's limited and nonexclusive video on demand right set forth in the final two sentences of this Subparagraph 6(b), Company shall have the exclusive right, license and authority to

46964v1

distribute, display, promote, advertise and use the Videograms via the Internet, including the right to sublicense such use to Club Jenna, Inc., and including the rights to market, sell, and display the Videograms through video on demand technology ("VOD"), via non-adult websites to be constructed by Company or its sublicensee. Revenues generated from the sale and distribution of the Videograms through VOD subscriptions or downloads shall be subject to the same terms and conditions for payment of Videogram Royalties as are set forth in subparagraph (c) below. AETN's exhibition rights in the Pilot and, if applicable, the Series, shall include the right to incorporate any and all episodes thereof in a package (or packages) of VOD titles available to AETN's cable/satellite distributors to promote the Networks to potential viewers, provided that, if AETN's VOD package (or packages) become(s) a source of significant revenue for AETN (rather than being principally a means of promotion for A&E Network and its sister networks), then AETN and Licensor shall negotiate a royalty or fee arrangement for AETN's continuing inclusion of the Programs in the VOD package (or packages). In the event AETN succeeds in negotiating an arrangement for similar promotional VOD use of its programming in a "walled garden" environment on the Internet, the VOD rights conveyed in this Subparagraph 6(b) shall extend to that use, as well.

c. **Videogram Royalties:** Company shall pay AETN a royalty equal to Twenty Five Percent (25%) of the Adjusted Gross Videogram Revenues derived from the distribution and exploitation of the Pilot and Series on Videogram, also known as "home video." "Adjusted Gross Videogram Revenues" shall be defined as all revenues actually received by Company or its agents from Videogram and/or Wireless/Mobile Network distribution of the Pilot and/or Series episodes, any compilation thereof, or other Videogram or Wireless/Mobile Network product produced from material contained in the Pilot, Series or any episodes thereof, less the actual costs incurred for sales taxes collected on direct-to-consumer sales, shipping and handling, quantity or trade discounts, third party sales commissions not to exceed ten percent (10%), returns, charge backs and refunds.

d. **Rights of Distribution:** AETN shall have the nonexclusive right to distribute Videograms through its customary channels, so long as AETN purchases or acquires the Videograms as "finished goods" from Company. Company shall sell Videograms to AETN for a price equal to Seventy-five Percent (75%) off the Suggest Retail Price specified by Company to its customers and/or distributors. Such "finished goods" provided to AETN by Company shall be fully returnable. AETN shall not be entitled to payment of Videogram Royalties for the units sold to AETN under this price structure.

7. **ARTIST'S SERVICES OF THE ESSENCE:** The parties acknowledge that the participation of Artist as the principal on-camera subject of the Pilot and, if applicable, the Series and in promotion of the Pilot and, if applicable, the Series (on-air and in other media and through interviews and personal appearances, as AETN reasonably requests) is of the essence of this Agreement. Company warrants and represents that the terms of its contract with Artist expressly provides that Artist shall fully perform the services required by AETN as provided herein to the best of her professional ability, and that Company has taken commercially reasonable steps to insure Artist's compliance with the terms of the contract for the entire term of this

46964v1

Agreement. If Artist at any time fails, neglects, refuses or is unable to perform fully, or in the event of Artist's incapacity, AETN may, in its sole election, terminate this Agreement, unless Company cures such breach or noncompliance and/or provides AETN written substantiation of a medical or mental condition from which Artist will recover or is expected to recover within a reasonable time, within ten (10) business days after AETN provides written notice of such breach or noncompliance.

8.    OPTIONS: AETN shall have the following options with respect to the the Series and Artist's services:

a.    The "Initial Option" to require Company to provide Artist's services for an additional number of episodes that will be determined by AETN, but shall consist of no fewer than ten (10) episodes and no more than twenty-six (26) episodes (collectively, "Season One"). If the Initial Option is to be exercised by AETN, such exercise must be made in writing and the notice of such exercise must be delivered to Company no later than three (3) months after the date on which the production company producing the Pilot actually delivers the fine cut of the Pilot to AETN. If AETN does not exercise the Initial Option, all additional options are waived. If AETN exercises the Initial Option, the term "Pilot" as used herein shall also include the "Series" and any episodes produced hereunder, unless explicitly stated to the contrary in this Agreement.

b.    Should AETN exercise the Initial Option, AETN shall have two (2) additional exclusive, dependent options; the "Second Option" and "Third Option," (with the episodes produced thereunder referred to collectively herein as "Season Two" and "Season Three," respectively), to require Company to provide Artist's services. Pursuant to each option, AETN may require Company to provide Artist's services for an additional number of episodes that will be determined by AETN but shall consist of no fewer than ten (10) episodes and no more than twenty-six (26) episodes per option. The Second Option shall be exercisable by written notice given by AETN to Company not later than two (2) months from the date of delivery to and acceptance by AETN of the fine cut of the final episode of the Initial Option. The Third Option shall be exercisable by written notice given by AETN to Company not later than two (2) months from the date of delivery to and acceptance by AETN of the fine cut of the final episode of the Second Option.

9.    INDEPENDENT CONTRACTOR: Company is rendering services to AETN hereunder as an independent contractor and its receipt of compensation hereunder shall not entitle Company or any person employed by Company, including Artist, to any pension, insurance or any other benefits of a staff employee. Nothing contained herein shall constitute a joint venture or partnership between AETN and Company.

10.    WORK FOR HIRE: AETN shall be the exclusive copyright holder of the Pilot and the Series and shall have sole discretion with respect to distribution of the Pilot and Series in all media, provided however that Company shall control home video distribution and wireless/mobile technology distribution pursuant to AETN's grant of rights to Company as provided herein. Company agrees that all services provided hereunder, including materials created or developed by Artist, her family, staff and colleagues, and any recordings utilizing Artist's services (and those of her family, staff
4696-tv1

and colleagues) shall be deemed "works-for-hire" under the United States Copyright Act of 1976, as amended. In the event that any such materials are not deemed works-for-hire in the United States or any other jurisdiction, Company does hereby assign all rights in and to such materials (and, to the extent possible, any elements or materials therein) to AETN for the life of the copyright, and further agrees that, as between Company and AETN, all materials, whether or not furnished by Company or used in connection with the services to be provided, shall be the sole and absolute property of AETN. AETN and any production company which it retains to produce the Pilot and/or Series shall have the right at any time to cut, edit, modify, add to, subtract from, arrange, rearrange, shorten and revise the Materials in any manner and by any methods which AETN may, in its sole discretion, determine; and Company expressly waives any so-called "moral rights" which may now exist in any jurisdiction, or may hereafter come into existence. AETN acknowledges that any such editing shall not be done to ridicule, belittle, embarrass or defame Artist, her family, friends, associates, staff or colleagues. Company warrants and represents that it shall obtain the written consent of Artist to the provisions of this paragraph 10, and that Artist shall execute any releases, licenses or consents AETN may reasonably require in order to protect and preserve its copyrights against claims by Artist, her agents or any other parties.

11.    EXCLUSIVITY:    Company agrees to provide, and warrants that Artist shall provide, "Artist's Services" exclusively to AETN against all media worldwide throughout the Term of this Agreement, throughout any extension(s) thereof and for forty-five (45) days following the termination or expiration of the Term (the "Exclusivity Period"). If AETN fails to exercise the Initial Option, and/or does not exercise the Second Option or the Third Option, Artist's exclusivity shall continue for ninety (90) days following the lapse of the last option. For the purpose of this exclusivity clause, "Artist's Services" shall mean participation by Artist as the principal or leading figure or as a regular supporting figure in any reality television program focusing on the daily life of Artist, including but not limited to spin-offs and sequels. During the Exclusivity Period, Artist shall not appear in any other reality television series without the express, written consent of AETN, provided however that Artist may appear in a "one-time only" capacity on another reality television program.

a.    Other Network Restrictions:    During the Exclusivity Period, Company warrants that, unless Artist obtains the express, written consent of AETN after full disclosure, Artist shall not provide recurring or regular professional services for any of the following television networks: Bravo; USA; VH-1; MTV; TNT; TBS; the networks of Discovery Communications; Court TV; E! and Style. Nothing contained herein is intended to restrict or prohibit Artist from providing professional services in connection with (i) celebrity interviews, (ii) productions or features which are not intended to be telecast via a restricted network but are nevertheless aired on a restricted network as a result of agreements over which Company or Artist have no effective right of control, or (iii) contractual requirements or obligations incident to or resulting from Artist's autobiography, "How to Make Love Like a Porn Star."

b.    Right of First Negotiation:    Following the expiration or termination of the Exclusivity period, AETN shall have a right of first negotiation for any sequel or spin-off of the Pilot or Series. At any and all times, Company shall inform AETN of any

46964v1

and all offers or pitches from any other producer or network with respect to any sequel, spin-off or television project which might be competitive with the Pilot and/or Series. In the event any offer or pitch from a competing television outlet or producer does not violate the Exclusivity Provision above or any Network Restriction above, AETN shall notify Company within fifteen (15) days after Company's notification pursuant to the previous sentence whether AETN intends to exercise its right of first negotiation. Unless AETN exercises its right within fifteen (15) days, AETN waives such right as to that specific project, and Company is free to negotiate directly with any other party regarding the offer or pitch.

12. **NON-EXCLUSIVE TRADEMARK LICENSE:** For the entire term of this Agreement, AETN shall have the non-exclusive license and right to use Artist's name, registered trademarks, image, likeness, biographical information, voice and recorded/filmed performance in connection with the Pilot and the Series, the advertising and promotion of the Pilot and the Series, institutional promotion of A&E Network (or any other network that is exhibiting the Pilot and/or the Series) and/or the programming thereof, including the right to grant the licensed rights to others. AETN agrees to use only biographical information supplied by or approved by Company and only the likenesses of Artist from the Pilot and/or the Series and/or likenesses provided by or approved by Company. This license is limited to the uses described herein and for no other purpose, it being understood that such use shall not extend to the direct or indirect endorsement of any product or service. Upon request by AETN, Company shall provide copies of such license agreements or other documentation that AETN may reasonably require to effectuate the purposes of this provision.

13. **WARRANTIES AND INDEMNITIES:** Company warrants and represents as follows:

a. Company has the contractual right and authority to enter into this Agreement and to bind Artist to the terms, provisions, covenants and restrictions contained herein, including without limitation the exclusivity and copyright provisions hereof.

b. The content of Artist's performance furnished hereunder, including but not limited to all spoken words and ideas expressed therein, shall be Artist's own original creation.

c. Company holds, on an exclusive basis, the rights which it is granting hereunder. No person or entity not a party to this Agreement has previously been granted any rights or concessions that will, can or may encumber, preclude, impede, undermine or vitiate the grant of rights being made by Company in this Agreement, and no person or entity has been the recipient of any promise or assurance regarding such rights or grant of rights.

d. No further grant of rights or permission from any party is necessary for production of a reality television program on the topic and covering the themes as contemplated under the terms of this Agreement.

46964v1

e.    Company warrants and represents that it has the right, capacity, authority and power to enter into and fully perform this Agreement.

f.    Company shall at all times indemnify and hold harmless AETN, the Pilot's or Series' sponsors, if any, their advertising agencies, if any, and the cable and/or satellite systems over which the materials are exhibited, and any other distributors or licensees of AETN, from and against any and all claims, damages, liabilities, suits, legal actions, costs and expenses, including but not limited to reasonable counsel fees, arising out of any breach or alleged breach by Company of any warranty, representation or obligation stated herein, including without limitation any claims of Artist or her agents.

14.    ACCOUNTING: The parties shall account to each other with regard to their shares of License Fees and Videogram Royalties on a quarterly basis. The quarterly periods shall end on March 31, June 30, September 30 and December 31 of each year; provided, however, that no accounting need be rendered for a period in which less than Fifty Dollars ($50.00) in License Fees or Videogram royalties are payable. Accountings shall be rendered on or before the date sixty (60) days following the conclusion of each accounting period and shall be accompanied by payment of the applicable revenue share due in accordance herewith, if any.

15.    RIGHT TO AUDIT: Either party may, at its own expense, and upon reasonable advance written notice to the other party, audit the other party's s books and records of account relating to Company's share of License Fees and AETN's Videogram royalties. Any such audit shall take place during normal business hours at the place that the applicable books and records are ordinarily kept; provided, however, that only one (1) audit shall be performed on the applicable books and records of account for any one (1) calendar year. All books and records and all data and information contained therein, except as required by law, shall be held in strictest confidence and shall not be disclosed to any party other than the auditing party's principals, counsel and accountants, provided that such accountants and any outside counsel acknowledge in writing that (a) they are bound by this confidence, and (b) they shall return all documents or copies thereof to the audited party upon completion of the audit. All books and records and all data and information contained therein shall be used solely for the purpose of reporting to the other party the amounts of any alleged errors in payment of either party's appropriate share of revenue hereunder. Each party shall have two (2) years from the date of the other party's submission of a statement to file a written objection to that statement. If either party notifies the other party in writing that it denies the validity of the objection, the first party shall have one (1) year from the date of such denial to file suit. Any statement not audited and/or objected to within two (2) years of submission shall be deemed conclusive and not subject to further contest with respect to the matters therein.

16.    CONFIDENTIALITY: The terms of this Agreement, any and all correspondence between or among the parties and their respective agents, and any information exchanged between the parties relating to an accounting or audit as provided herein, is deemed to be confidential and proprietary information. Except as required by applicable law, government order, rule or regulation, or by order or decree of any court of competent jurisdiction, neither Company nor Artist (nor any agent of either) shall divulge to any third party any of the terms or conditions of this agreement (including

46964v1

without limitation, the fees to be paid for Artist's services); provided, however, that it shall not be a violation of this provision for Company, Artist or any agent of either to discuss publicly the Pilot and/or Series after such time as the parties have issued a mutually-agreed press release announcing the Pilot and/or Series. For avoidance of doubt, the parties acknowledge that final decision as to the timing, wording and means of dissemination of the initial public announcements of the Pilot and the Series (or any season thereof) shall rest with AETN, which shall make such decision in its sole discretion after significant consultation with Company and Artist.

17. NOTICES: Under this Agreement if one party is required or permitted to give notice to the other, such notice shall be deemed given either (a) twenty-four (24) hours after transmittal by facsimile (with confirmation copy forwarded promptly via the U.S. Postal Service, first-class postage pre-paid), so long as the transmitting party receives a facsimile delivery confirmation, or (b) three (3) business days after depositing the notice in the U.S. mail, first-class postage pre-paid, if the notice was sent to the other party at the following address or facsimile number:

IF TO AETN:

A&E Television Networks
235 East 45th Street
New York, New York 10017
Attn: Senior Vice President, Programming, A&E Network
Fax (212) 210-9016

With a copy to:

Senior Vice President & General Counsel
235 East 45th Street
New York, New York 10017
(212) 210-1308

IF TO COMPANY:

John G. Grdina
15270 N. 83rd Place
Scottsdale, AZ 85260
Fax (480) 556-9580

With a copy to:
Gary L. Crandell, Esq.
Gary I. Crandell, P.C.
1001 South Monaco Parkway, Suite 300
Denver, Colorado 80224
Fax (303) 322-4960

And a copy to:

46964v1

Sean Perry
The Endeavor Agency
9601 Wilshire Blvd.
Beverly Hills, CA 90212
Fax : (TO COME)

18.    MISCELLANEOUS PROVISIONS:

(A)    Force Majeure: Either party shall be excused from delays in performing or from its failure to perform hereunder to the extent that such delays or failures result from causes beyond the reasonable control of such party, including without limitation acts of God, nature, any government agency, war, civil disturbance, labor disputes or shortages, electrical or mechanical breakdown, inability or refusal of a common carrier to provide communications capabilities, or any other cause beyond either party☐s direct control, including but not limited to, the issuance of an order by any regulatory, administrative, judicial or legislative prohibiting or interfering with either party from carrying on its day-to-day operations as contemplated under this Agreement.

(B)    Choice of Law and Venue:    This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to contracts made and to be fully performed therein, and the parties consent to the exclusive jurisdiction of the State and Federal Courts located in New York County, New York in connection with disputes arising under this Agreement.

(C)    No Waiver:    The terms and conditions of this Agreement may be waived or amended only in writing and only by the party that is entitled to the benefits of the term(s) or condition(s) being waived or amended.    A waiver by either of the parties hereto of any of the covenants, conditions, or agreements to be preformed by the other shall not be construed to be a waiver of any succeeding breach or of any covenant, conditions, or agreement herein contained (whether    or    not the provision is similar).

(D)    Entire Agreement:    This Agreement constitutes the entire Agreement of the parties with regard to the subject matters addressed in this Agreement.    This Agreement supersedes all prior or contemporaneous agreements, discussions, or representations, whether oral or written, with respect to the subject matter of this Agreement. The terms and conditions of this Agreement cannot be varied, amended, changed, waived, or discharged except by a writing signed by all parties hereto.

(F)    Neutral Construction:    The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them and that the provisions of this Agreement therefore should not be construed against a party or parties on the grounds that the party either drafted the provision(s) or had a larger responsibility in drafting the provision(s) than the other party.

(G)    Unenforceability:If any provision of this Agreement or any word, phrase, clause, sentence, or other portion thereof should be held to be unenforceable or invalid for any reason, then, provided that the essential consideration for entering into this

46964v1

Agreement on the part of any party is not unreasonably impaired, such provision or portion thereof shall be modified or deleted in such manner as to render this Agreement as modified legal and enforceable to the maximum extent permitted under applicable law.

IN WITNESS WHEREOF, the parties have set forth their hands to be effective on the _____ day of ~~December,~~ 2004.
                    *January*

AETN:

A&E TELEVISION NETWORKS
A New York partnership

By _____
       Anne S. Atkinson          1/13/05
       Senior Vice President & General Counsel

COMPANY:

DOLCE AMORE, INC.,
a Colorado corporation

By _____
    John G. Grdina, President

Approved and Accepted:

The Endeavor Agency

By _____
Sean Perry, Agent

46964v1

## ARTIST'S LETTER OF INDUCEMENT

In order to induce A&E TELEVISION NETWORKS ("AETN") to enter into the foregoing Agreement with DOLCE AMORE, INC. (the "Company"), and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby consents and agrees to the execution and delivery of said Agreement by Company and hereby agrees to render all the services therein provided to be rendered by the undersigned, to grant all the rights granted therein, and to be bound by and duly to perform and observe each and all of the terms and conditions of said Agreement regarding performance or compliance on the undersigned's part, and hereby joins in all warranties, representations, obligations, agreements and indemnities made by Company, and further confirms the rights granted to AETN under said Agreement and hereby waives any rights of *droit moral* or any similar rights which the undersigned may have. The undersigned further waives any claim against AETN for wages, salary or other compensation of any kind pursuant to said Agreement or in connection with the Pilot and/or Series and the exercise by AETN of its rights therein or derived therefrom (provided, however, that such waiver shall not relieve AETN of any of its obligations to Company under said Agreement), and the undersigned agrees to look solely to Company for any and all compensation to which the undersigned is or may become entitled to receive in connection with the Agreement, the Pilot and/or the Series.

Dated as of __1/2/05__

Jenna Massoli, p/k/a Jenna Jameson

46964v1